Mrs. Frances S. CHEEK, Plaintiff,

v.

FLOYD COUNTY, GEORGIA, Defendant.

Civ. A. No. 1921.

United States District Court,
N. D. Georgia,
Rome Division.

Jan. 29, 1970.

Robert M. Brinson, Rogers, Magruder & Hoyt, Rome, Ga., for plaintiff.

Arthur K. Bolton, Atty. Gen., Richard L. Chambers, Joel C. Williams, John A. Sligh, Jr., Asst. Attys. Gen., Atlanta, Ga., George R. Anderson, Rome, Ga., for defendant.

SIDNEY O. SMITH, Jr., District Judge.

This is a diversity suit in which the plaintiff seeks to recover damages to her property, claimed to have been occasioned by the construction of the "East Rome Interchange Project", a state highway facility to which it is adjacent. None of her property was taken for the project. However, certain grade and traffic changes were made to public streets and highways bordering the property which it is contended caused the damages claimed. As originally constituted, the suit sought recovery for:

(1) Loss of public access, temporary and permanent.

(2) Change of grade.

(3) Loss of parking, both on-premises and off-premises.

(4) Physical damage from the construction both temporary and permanent.

(5) Noise, fumes and lights as continuing damage.

Heretofore, the court on motion has considered some of the legal problems involved in such claims when the property owner does not occupy the status of a condemnee under eminent domain proceedings. However, inasmuch as evidence has now been taken, and a trial by view had by the court, the entire problem must be reconsidered in light of the facts.

## FINDINGS OF FACT

The facts are best understood by reference to the appended Exhibit "A", which represents the situation before the project and Exhibit "B" which represents the situation after completion of the project.

In 1959, plaintiff entered into a contract to purchase the property in question from Lucia McKay for $90,000 and to that end, the parties made substantial repairs on its two buildings; one being the 14-unit Eastwood Apartment House and the other being a 900 square foot

store building known as the "SCOTCH WASH." Apparently, the plaintiff took over the effective ownership of the property under the contract at such time, although no deed was executed until June, 1963.

The property is triangular in shape and is located in the northwest corner of the intersection of Brooks Avenue [1] and East 2nd Avenue in Rome, Georgia. Prior to the purchase, Brooks Avenue north had been four-laned to a point just east of the center of the apartment house and traffic islands installed, controlling traffic into the intersection from East 11th Street on the east, Brooks Avenue on the north, and East 2nd Avenue on the west and toward the south. This arrangement permitted vehicular access to the property from Brooks Avenue (proceeding North), East 11th Street (traveling West), East 2nd Avenue (traveling South and West) and, remotely East 10th Street (traveling North). At the time, and for many years prior thereto, the property had used 25 feet of the right-of-way between East 2nd Avenue and the West line of the property for parking for both the apartment house and "Scotch Wash". In addition, a parking apron had been paved just west of the "Scotch Wash" building within the property limits for such purpose. Traffic from all the directions mentioned above had, in fact, approached the intersection and utilized the on-property and off-property parking areas described. Also, on-street parking was allowed on Brooks Avenue.

On July 28, 1965, work began on the project, of which this intersection is a part, which primarily involved the extension of the four-laned Brooks Avenue to the south to an interchange of major highways and the construction of access ramps to the interchange. All construction, including paving was completed by September 20, 1966, and the project accepted in December, 1966. Local traffic was maintained for all but a few days, but the project occasioned the usual annoyances of dust, mud, noise and temporary loss of access attendant to any such undertaking.

Insofar as physical changes are concerned, Ramp "B" was constructed leading from Brooks Avenue westerly into East 2nd Avenue and Ramp "A" was constructed leading from East 2nd Avenue southerly to the interchange. In addition, Brooks Avenue was widened and paved from its former terminus southerly to the interchange. At the time, the plaintiff sought to have Ramp "B" constructed with a valley curb, which would continue to admit vehicular traffic all along her western line into the property. Nonetheless, it was constructed with a 4″ mountable, i. e. rounded, curb, which effectively discourages such practice. The right-of-way between the old street and sidewalk has been reduced to 12 feet. While cars continued to use the old areas devoted to parking, both on and off the property, they do so only by "bumping up" the curb or by entry at the existing driveway at the northwest end of the property and traveling down the old sidewalk and unpaved right-of-way. Parking insofar as Brooks Avenue and the parking area on the north side of the property are concerned is virtually unaffected. Ramp "B" is elevated above Brooks Avenue in a westerly direction into East 2nd Avenue. Ramp "A" is elevated even higher than Ramp "B" and was constructed over a large fill toward the south.

Traffic patterns have been materially changed. The only access to the property remaining is from Brooks Avenue on the east; from Brooks Avenue traveling south into Ramp "B" on East 2nd Avenue; and from travel north on Ramp "A" into East 2nd Avenue. Any reasonable access from 10th Street, 11th Street, or 2nd Avenue from the east and west, except from the two ramps has been denied by the construction of curbed dividers.

1. Subsequently renamed Turner-McCall Boulevard.

## CONCLUSIONS OF LAW

The Constitution of the State of Georgia provides in relevant part: "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid. * * *" The parties here concede that the injuries complained of do not involve a taking of property but involve only a damaging of property. A threshold question which requires consideration is the scope of the term "damaged," i. e., does any diminution of private property occasioned by governmental action constitute a damaging within the meaning of this constitutional provision? At the outset it should be noted that mere depreciation in value as damages has been rejected in most jurisdictions as too broad and these jurisdictions have required that the injuries complained of must fall within some narrower definition of "damage." 2 Nichols on Eminent Domain, § 6.441 [1] at 488 (3rd Ed. 1963). For a discussion of the reasons for rejecting such a rule, see Nichols, *supra* at 491. See, *e. g.*, Austin v. Augusta Terminal Ry. Co., 108 Ga. 671, 34 S.E. 852, 47 L.R.A. 755 (1899); Peel v. The City of Atlanta, 85 Ga. 138, 11 S.E. 582, 8 L.R.A. 787 (1890). The Illinois courts were the first to struggle with this problem of defining the scope of this provision and evolved a definition of damage in the constitutional sense which has been generally accepted by the states having similar provisions.

> [C]ompensation is required not only when there is an injury that would be actionable at common law, but also in all cases in which it appears that there hàs been some *physical* disturbance of a right, either public or private, which the owner of a parcel of land enjoys in connection with his property and which gives it an additional value, and that by reason of such disturbance he has sustained a special damage with respect to his property in excess of that sustained by the public generally.

Nichols, *supra* at 495–496. A similar view has been taken by the Georgia courts. See, *e. g.*, Pause v. City of Atlanta, 98 Ga. 92, at 99, 26 S.E. 489 (1895). The above generalizations are admittedly vague and rather unhelpful. Specific determinations would more appropriately come from the state appellate courts, but the status of the present case demands a discussion of the various claims asserted here.

(1) The first element to be considered is the claim of a material interference with access to plaintiff's properties. The crucial inquiry here is whether the Georgia cases have required a complete or near complete deprivation of access to one's property or whether damages are recoverable when access is blocked from only one or more directions. The general rule as to access is stated in 2 Nichols on Eminent Domain, § 6.442.

> * * * when the means of ingress and egress of premises abutting upon a public street to and from the street are physically obstructed by the manner in which the street is used, altered, or improved under legislative authority * * * the owner of such premises is entitled to compensation so far as *such impairment of access depreciates the market value* of his property. [citing Georgia cases].

For another general statement of the rule, see 29A, C.J.S. Eminent Domain § 122 at p. 483–485. In Clayton County v. Billups Eastern Petroleum Co., 104 Ga. App. 778, 123 S.E.2d 187 (1961), the Court upheld a finding of a substantial impairment to an abutting property owner's right of ingress and egress by the conversion of a highway from an unlimited to a limited access road, though a service road was provided by which plaintiff's property could be reached indirectly. The Court noted that there was no obligation upon the county to provide plaintiff with customers by furnishing a flow of traffic by his place of business, but that *"the defendant is liable for any interference with the right*

*of ingress and egress to the petitioner's property"*, insofar as this results in a diminution in the market value of the property. *Id.* at 782, 123 S.E.2d at 190. The Court also emphasized that other jurisdictions have allowed compensation for impairment of pre-existing access even though there is available a means of indirect access, whether from other existing streets or by construction of service or feeder roads, citing 43 A. L.R.2d 1077(4). For another similar discussion, see City of Atlanta v. Dinkins, 46 Ga.App. 19 at 25, 166 S.E. 429 (1932). See also, Johnson v. Burke County, 101 Ga.App. 747, 115 S.E.2d 484 (1960). Cf., cases cited in 29A C.J.S. Eminent Domain § 122 at p. 485, fn. 2.-10. In Decatur v. Settles, 107 Ga.App. 150, 129 S.E.2d 212 (1962) the Court indicates by way of dicta that complete loss of access in a particular direction may be compensable as a practical matter, only if the obstruction is within the first intersecting block.[2] Accordingly, relevant inquiry is *whether the interference with access is* (1) *complete as to one or more directions* and is (2) *material* so as to result in a diminution in market value of the property. This necessarily involves a factual determination in each case. See 29A C.J.S. Eminent Domain § 122 at p. 485, fn. 2. There must, of course, be a substantial change

in access to authorize any claim. State Highway Board v. Baxter, 167 Ga. 124, 144 S.E. 796 (1928); Howell v. Quitman, 169 Ga. 74, 149 S.E. 779 (1929); Horten v. City of Atlanta, 116 Ga.App. 350, 157 S.E.2d 501 (1967). Mere "circuity of travel" is not actionable. Hadwin v. Mayor & Aldermen of Savannah, 221 Ga. 148, 143 S.E.2d 734 (1965). This is not to say, however, that the facts as developed may not show that the deprivation of access is so slight as to fail to show a material deprivation of access or a lack of diminution in market value. The rule as to temporary obstructions is different. Here, the access must be totally cut off before damages can be considered. 2 Nichols on Eminent Domain, § 6.4443 at 576. This principle tends to run contrary to the generally recognized rule that mere temporary inconvenience is not a compensable damage. However, the exception as to a temporary but, complete isolation is clearly justifiable on logical and equitable grounds.

■■ (2) The element of change of grade is closley connected to previously discussed element, for ordinarily a change in grade will give rise to a claim of deprivation of access. See, City of Atlanta v. Dinkins, 46 Ga.App. 19, 166 S.E. 429 (1932). Likewise, these two elements insofar as they give rise to a

2. This discussion leads into the limitations involved in the cul-de-sac principle. The most comprehensive discussion of the principle is found in Tift County v. Smith, 219 Ga. 68, 131 S.E. 2d 527 (1963), one of the many cases involving the changing of a highway to a limited access type. In Floyd County v. Griffin, 109 Ga.App. 802, 137 S.E. 2d 483 (1964), the Court indicated that the mere cutting off of access to the city by way of only one street involved mere inconvenience and did not present a case of compensable damage. However, this holding dealt with a non-abutting land owner and was in substance a mere reiteration of the principle set forth in *Tift County, supra.*
There are other well recognized exceptions to the generalization made in the text. For example, the Georgia Courts have held that the access of an abutting

owner as to a particular direction must be substantially impaired, *i. e.,* curbing does not block off reasonable access if access is permitted at various intervals in the curbing. See, *e. g.,* State Highway Board v. Baxter, 167 Ga. 124 at 133, 144 S.E. 796 (1928); Johnson v. Burke County, 101 Ga.App. 747, 115 S.E.2d 484 (1960). Moreover, no compensable damage occurs when a person locates his business adjacent to an existing limited access road. See Clayton County v. Billups Eastern Petroleum Co., 104 Ga.App. 778 at 782, 123 S.E. 2d 187 (1961). It should also be noted that a mere change of route, so as to deprive an abutting highway of travelers is not compensable and should be distinguished from the case of lack of access to an existing highway, which is improved.

cause of action for damages involve similar considerations. Under Georgia's Constitution it is well established that an abutting owner has suffered a compensable damage when a lawful alteration of the grade of the street in front of his property occurs in such a way as to depreciate the market value thereof. See, *e. g.*, State Highway Department v. Murray, 102 Ga.App. 210, 115 S.E.2d 711 (1960) ; 2 Nichols on Eminent Domain § 6.4441[9]. and [10]. Again the extent to which the change of grade affected the market value of plaintiff's property may range from none to substantial.

(3) Over and above any element of loss of access or change of grade, the plaintiff here seeks to recover damages for loss of parking spaces as such. For such claim, the plaintiff relies on State Highway Dept. v. Alexander, 222 Ga. 354, 149 S.E.2d 788 (1966). However, examination of the facts there shows that the point at issue was just compensation for an area previously used for parking *on the owner's property*. Here, the parking spaces claimed as lost were located within the pre-existing right-of-way or *on public property*. There being no taking of private property, there can be no claim for damages merely because that use has been changed. See generally Schlesinger v. City of Atlanta, 161 Ga. 148, 129 S.E. 861 (1925) ; Johnson v. Burke County, 101 Ga.App. 747, 115 S.E.2d 484 (1960). This follows for the reason that once property is acquired or dedicated by the State to a particular public use it may be put to all customary uses within the definition of use. Only when the change materially interferes with the use of the original acquisition or dedication is there an actionable diversion. Reicheld-erfer v. Quinn, 287 U.S. 315, 53 S.Ct. 177, 77 L.Ed. 331 (1932) ; Norton v. City of Gainesville, 211 Ga. 387, 86 S.E. 2d 234 (1955). It is therefore, concluded that the loss of any off-property parking spaces does not create any damages. With this element removed, plaintiff's only other claims as to on-property

parking are merely repetitious of the claim for loss of access.

(4) The allegations as to physical injury caused by mud and vibrations present rather difficult problems. It is generally held that a definite, physical injury cognizable to the senses which has a perceptable effect on present market value, constitutes a damage in the legal sense. 2 Nichols, *supra* at § 6.4431. Georgia recognizes the general rule that damages for depreciation of property resulting from physical damage to property are recoverable. Richmond County v. Williams, 109 Ga.App. 670, 137 S.E.2d 343 (1964) (damage from vibrations caused by pile driving machinery). Yet, mere elements of inconvenience or irritants to occupants or users of the land are not compensable. *Id.* at 675, 137 S. E.2d 343. Therefore, it must be shown among other things that such factors are a continuous and permanent incident of the improvements on the damaged property. See State Highway Dept. v. Hollywood Baptist Church of Rome, 112 Ga.App. 857 at 860, 146 S.E.2d 570 (1965).

And not only must plaintiff show that the condition was permanent but also that the new condition was the necessary concomitant of the road design. Hollywood Baptist Church of Rome v. State Highway Dept., 112 Ga.App. 857, 146 S.E.2d 570 (1965), 114 Ga.App. 98, 150 S.E.2d 271 (1966).

(5) Plaintiff also argues that the noise, fumes and light beams from passing traffic constitute another of the elements of compensable damage. Apparently, there would be no question as to the permanent nature of these elements. However, there are serious questions as to whether these elements are compensable. To the extent that these elements could be classed as instances of mere inconvenience or instances suffered by the public in general along the project, then no compensation would be allowed. But beyond this, can these elements be considered as compensable? The Georgia cases dealing with these elements are

not numerous. However, the recent case of State Highway Dept. v. Hollywood Baptist Church of Rome, *supra*, indicates that noise may be considered in determining damages if it is shown that the noise is a continuous and permanent incident of the improvement to be made and that it in fact specially affects the market value of the property.

▮ A case involving condemnation or inverse condemnation is distinguishable in legal theory from a tort action, where the doctrine of governmental immunity provides a sometimes insurmountable barrier. But the courts in dealing with inverse condemnation have relied heavily upon tort doctrines, especially the nuisance doctrine. See Mandelker, A Review of Inverse Condemnation, ABA Law Notes: October, 1966, wherein this theoretical background is more fully discussed. See 29A C.J.S. Eminent Domain § 110 at p. 450. As indicated before, the Georgia cases are not clear on the compensability of elements such as noise, fumes and light beams. At least the claimant would have to show injury that was distinguishable from the public in general along the project. Moreover, the Court would expect that the proof should show that these elements were so severe as to amount to a legal nuisance, rather than a mere nuisance in fact. The damages must be distinguished as special when compared with the damage suffered by the public generally along the project. For example, it would be an impossible burden on the various governmental entities connected with development of highways if every landowner who could hear passing traffic could recover damages. True, the noise from passing traffic makes property less desirable for a number of reasons. But highway construction would be virtually impossible if such recovery were allowed in every case. See Richmond County v. Williams, 109 Ga.App. 670 at 675, 137 S.E. 2d 343 (1964).

▮ (6) One of the most difficult questions in this case is the proper measure of damages in the event of a recovery. It is strongly suggested by plaintiff, and this is relevant to a number of the claims asserted, that the proper measure of damages should include the damage to plaintiff's businesses of an apartment house and laundromat. In taking this position plaintiff relies upon Bowers v. Fulton County, 221 Ga. 731, 146 S.E.2d 884 (1966) wherein the court held that where the evidence shows that a condemnee sustained damages and incurred expenses incident to the removal of his business, the trial court must not merely charge the jury with regard to the land taken but must include also the damages to the condemnee's business and expenses incident to the removal of the business from the land. In reaching this decision the Court overruled in relevant part a long line of cases to the contrary, including *Pause, supra*, although the Court confuses the issue by indicating the "pronouncement of these cases was obiter dictum." *Id.* at 736, 146 S. E.2d at 889. The key to this decision was the broad definition of the term property found in 18 Am.Jur. § 156 at 787.

> The term [property] comprehends not only the thing possessed, but also, in strict legal parlance, means the right of the owner in relation to land or a thing; the right of a person to possess, use, enjoy and dispose of it, and the corresponding right to exclude others from the use.

Plaintiff argues that the *Bowers* holding was not based upon the status of the complaining party, *i. e.*, a condemnee, as is argued by defendant, but was based upon the nature of the term "property" found in the constitutional provision. Plaintiff also relies upon the overruling of a portion of *Pause, supra*. *Pause*, which involved a non-condemnee, had held in part that "* * * the profits of the business are not recoverable by way of damages, but evidence that the business was profitable is admissible to illustrate and throw light upon the value of the premises for rent." 98 Ga. 92 at 105, 26 S.E. 489, at 493. If the

Court had deliberately contended that its decision apply to condemnees only, then the Court could have easily distinguished *Pause* as a case involving a non-condemnee. But the Court did not take this approach. Instead, *Pause* was overruled as to this point. The Court in *Bowers* specifically mentioned that this conclusion in *Pause* "resulted from a failure to perceive that the right of the owner to recover for damage done his property was inclusive of damages to every species of property, real and personal, corporeal and incorporeal. All of these cases were predicated upon the concept that the constitutional provision in referring to property meant only physical or corporeal property. The view is too narrow." 221 Ga. at 737, 146 S.E.2d at 889. By these pronouncements in reference to a case involving a non-condemnee, the Court would seem to have indicated that its ruling was intended to extend to both condemnees and non-condemnees whose property had been taken or damaged in a constitutional sense. But setting aside for the moment the logic of this decision, it should be noted that the language found later in this opinion seems to limit somewhat its holding. The Court further states that there can be

> ⁎ ⁎ ⁎ no disagreement concerning the conclusion that a *condemnee* is under the constitutional provision entitled to just compensation for every species of property taken or damaged, real or personal, corporeal or incorporeal.

*Id.* at 737, 146 S.E.2d at 890. The Court then continues to make reference to only condemnees. The cases decided by the Supreme Court of Georgia after *Bowers* have not given a clear indication as to whether that case was intended to extend to non-condemnees. The Georgia Court of Appeals has taken a rather restrictive view of *Bowers*. For example in Hollywood Baptist Church of Rome v. State Highway Dept., 114 Ga.App. 98, 150 S.E.2d 271 (1966), the Court states:

In *Bowers* the elements of compensable damage included loss of business, loss of profits, expenses of moving [the] business, and so on. There the entire holding of the condemnee was involved.

*Id.* at 99, 150 S.E.2d at 274. In light of the Georgia Supreme Court's failure to speak in this area, this Court is inclined to follow the restrictive approach taken by the Georgia Court of Appeals. The view that loss of profits to a condemnee is an element of damage is not generally accepted. However, to go one step further and allow loss of profits and injury to the business of a non-condemnee is going even a further step. It is an admirable aim to attempt to compensate fully each person injured by government action. And yet the more remote the damage, the more caution must be exercised in allowing recovery, for the public interests are at stake also. The greater the cost arising from the payment of damages the greater the expense to the public. The courts cannot entirely overlook the interest of the public and at some point must draw the line between the elements that merit compensation and the elements that do not. Accordingly, it is concluded that the loss of business occasioned by the project is not, under these circumstances, compensable.

## DAMAGES

In light of the above it is apparent that the only legally sustainable claims for damage lie in two areas: for (1) loss of access and (2) change of grade, really the same type of loss in this case and for (4) physical damage and (5) noise, fumes and light, the nuisance-type claims. As seen, the measure of damages for the former is restricted to any loss in market value caused by such change. The latter being linked to consequential damages, the measure of damages for it is likewise restricted to any permanent loss in market value

caused by such factors. Loss of business,[3] as seen, is not a proper element for consideration in this case.

Overall the plaintiff apparently made a "bad buy". Prior to the project, the apartment was worth, at best, $67,100 and, after the project, $53,700 according to plaintiff's own appraiser. The same witness fixed the before value of the "Scotch Wash" at $9,000, based on $1.25 per square foot rental and capitalized at 12%, and only $500 afterwards. The maximum evidence of loss due to all factors is $22,300. Moreover, only one-third of this loss was allocated to accessibility and nuisance from noise, lights, etc. and two-thirds to the loss of off-property parking spaces (already held not to be recoverable). Other evidence in the case fixed the loss at Zero.

Whatever loss was suffered over the years in question, the court is convinced that other factors besides the project contributed. These would be a general deterioration in the neighborhood, the availability of newer and more desirable rental facilities, both apartment and commercial, the effect of shopping center development and the like.

Nonetheless, the plaintiff has proved a case of substantial loss of access which has reduced the market value of her property. The court finds no loss from change of grade except as it affects this loss of access. There is no proof of physical damage from the nuisance factors,[4] and any depreciation in value from noise, lights, etc. is minimal as it could exceed that of other property owners only slightly. In this connection, a claim of special damage is sustainable due to the construction of the ramps, causing lights to be cast directly on the apartment from Ramp "A" and "gear shift" noise to emanate from both. It is apparent to the court that the intersection was heavily used by trucks and other heavy equipment both before and after the project.

Specifically, then, the court finds the following types of damages to have occurred:

| | | |
|---|---|---|
| (1) | Loss of access, temporary and permanent | $5,500.00 |
| (2) | Change of grade | NONE |
| (3) | Loss of parking | NONE |
| (4) | Physical damage, temporary and permanent | NONE |
| (5) | Permanent nuisance damage | 1,000.00 |
| | TOTAL | $6,500.00 |

Accordingly, judgment may issue in favor of the plaintiff for such amount.

It is so ordered.

3. On this item, the plaintiff's evidence was extremely vague. As to the apartment, she claims a decrease in occupancy and a greater rate of turnover. At some periods since the project, occupancy has dropped as low as 60%. One witness felt it "ought to be" 85–100%. However, cross-examination revealed that there has been an occupancy problem since 1963. On the facts, the court is inclined to the view that the occupancy problem is affected only slightly by the project. As to the "Scotch Wash", its business deteriorated from an apparent high gross of some $9,000 in 1960 down to less than $3,600 in 1964, a year before the project commenced. At this time, the expenses exceeded the receipts and the operation was actually losing prior to the project. On the facts, there was no loss of business in the "Scotch Wash" due to the project.

4. As seen such a claim is legally permissible. However, the only specifics of damage offered were a claim of shrubbery lost, later shown to have been due to a freeze in early 1963, and a vague claim of dust damage. However, there was no proof of dollar loss as to the latter.